**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **Debra Rojas,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **Tolteca Enterprises d/b/a** | § | |
| **Phoenix Recovery Group; Travelers** | § | |
| **Casualty and Insurance Co. of America,** | § | |
| **& The Reserve at Springdale, LP,** | § | **Case No: 1:19-cv-00775-JRN** |
| **Defendants.** | § | |
| | § | |
| | § | |
| | § | |
| **The Reserve at Springdale, LP** | § | |
| **Third-Party Plaintiff** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **Lincoln Apartment Management** | § | |
| **Limited Partnership** | § | |
| **Third-Party Defendant** | § | |
| | § | |

**THE RESERVE AT SPRINGDALE, L.P.'S THIRD-PARTY COMPLAINT**

COMES NOW, Defendant/Third-Party Plaintiff, The Reserve at Springdale, LP ("The Reserve" and/or "Third-Party Plaintiff"), and pursuant to Fed. R. Civ. P. 14(a) hereby brings its Third-Party Complaint against Third-Party Defendant Lincoln Apartment Management Limited Partnership ("Lincoln"), seeking defense and indemnification from Lincoln for the claims brought by Plaintiff Debra Rojas ("Rojas") against The Reserve, and in the alternative requesting that Lincoln be required to contribute to any potential judgment or loss suffered by The Reserve, on a proportionate basis, to the extent that the alleged negligence and/or other fault of Lincoln was the cause of the damages Plaintiff seeks to recover, if any.  In support, The Reserve alleges as follows:

1

## I.      PARTIES

1.      Third-Party Plaintiff is a Texas limited partnership with its principal place of business at 1124 S. IH 35, Austin, Texas 78704.

2.      Third-Party Defendant is a limited partnership formed under the laws of Delaware, and can be served with process through its registered agent, CT Corporation System, at 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

## II.      JURISDICTION AND VENUE

3.      This Court has supplemental jurisdiction over the claims asserted in the third-party complaint because the claims asserted in the third-party complaint arise out of the same facts and circumstances as the claims asserted in the Original Complaint and/or any amendment thereto and are so related to the claims asserted in the Original Complaint and/or any amendment thereto that they form part of the same case and controversy under Article III of the United States Constitution. 28 U.S.C. § 1367(a); F.R.C.P. Rule 14.

4.      Venue is proper under 28 USC §1391(b)(2), as substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

## III.      FACTS

5.      The Reserve re-alleges and incorporates Paragraphs 1 through 5 of this Third Party Complaint as though fully set forth herein.

6.      On August 1, 2019, Rojas commenced this action by filing her Original Complaint against Tolteca Enterprises d/b/a Phoenix Recovery Group ("Tolteca") and Travelers Casualty and Insurance Co. of America ("Travelers"), alleging violations of the Fair Debt Collections Practices Act (FDCPA) and the Texas Debt Collection Act (TDCA).  (Doc. 1).

7.      On February 13, 2020, Rojas filed her First Amended Complaint to add The Reserve as a defendant, alleging that The Reserve violated the TDCA. (Doc. 44).

8.      On March 23, 2020, The Reserve filed a Rule 12(b)(6) Motion to Dismiss (Doc. 58), which the Court denied on May 7, 2020 (Doc. 75).

9.      On May 21, 2020, The Reserve filed its Answer and Affirmative Defenses. (Doc. 78).

10.     At all relevant times, The Reserve was the owner of an apartment complex known as "The Reserve at Springdale" located at 5605 Springdale Road, Austin, Texas 78723 ("Apartment Complex").

11.     At all times relevant to this lawsuit, The Reserve had engaged Lincoln as an independent contractor to manage the Apartment Complex and lease the units in it.  Please see a true and accurate copy of the "Management and Leasing Agreement" between The Reserve and Lincoln attached hereto as **Exhibit "A."**

12.     Lincoln supervised, managed and operated the Apartment Complex at all times relevant to this lawsuit.   *See* Exhibit "A" at ¶ 3(a).

13.     At all relevant times, Lincoln negotiated new leases and renewals of existing leases at the Apartment Complex.  *Id.* at ¶ 3(d)(ii).

14.     At all relevant times, Lincoln handled tenant requests and negotiations at the Apartment Complex.  *Id.* at ¶ 3(d)(iii).

15.     At all relevant times, Lincoln was responsible for terminating tenancies, including using commercially reasonable efforts to assure tenants' compliance with lease terms.  *Id.* at ¶ 3(d)(iv).

16.     At all relevant times, Lincoln calculated any recapturable expenses and billed tenants therefore.  *Id.* at ¶ 3(m).

17.     At all relevant times, Lincoln was responsible for collecting rents and other charges from tenants.  *Id.*

18.     Rojas rented an apartment at the Apartment Complex.

19.     Rojas's lawsuit arises out of an alleged debt related to her tenancy at the Apartment Complex, the accounting thereof, and alleged collection activities regarding same.

## IV.     CAUSES OF ACTION

### Count I – Defense and Indemnity

20.     The Reserve re-alleges and incorporates Paragraphs 1 through 18 of this Third Party Complaint as though fully set forth herein.

21.     The "Management and Leasing Agreement" between The Reserve and Lincoln contains the following provision entitled "INDEMNIFICATION":

> "…To the maximum extent permitted by law, Manager (Lincoln) shall indemnify, hold harmless, protect and defend (with counsel reasonably acceptable to Owner (Reserve)) Owner (Reserve)…from and against any and all claims, demands, actions, fines, penalties, liability, losses, taxes, damages, costs, injuries, and expenses (including without limitation, reasonable attorneys' consultants' and expert witness' fees and costs) (collectively, "Damages") in any manner related to, arising out of or resulting from (i) any default by the Manager (Lincoln) in its obligations under this Agreement; (ii) any acts of Manager (Lincoln) beyond the scope of its authority under this Agreement; and (iii) any gross negligence, willful misconduct or fraud of Manager (Lincoln) or any agent or employee of Manager (Lincoln)."

*Id.* at ¶ 4(a).

22.     Rojas's alleged claims against The Reserve arise from the performance of functions at the Apartment Complex that Lincoln had been contracted to perform.

23.     It was the agreement and intent of The Reserve and Lincoln in signing the "Management and Leasing Agreement" that The Reserve would be indemnified and defended by Lincoln for any claims "in any manner related to, arising from or resulting from" Lincoln's failure to perform its obligations under the agreement.

24.     The Reserve has fulfilled all conditions precedent under the "Management and Leasing Agreement" that Lincoln executed and agreed to.

25.     Lincoln is contractually obligated to defend and indemnify The Reserve for all liabilities that may result from the claims asserted against The Reserve by Rojas.  Lincoln has not fulfilled its obligations.

WHEREFORE, Third-Party Plaintiff Reserve respectfully requests that the Court order Lincoln to indemnify and reimburse The Reserve fully in connection with the claims underlying Rojas's First Amended Complaint and for any and all other liability arising out of the allegations in Rojas's Complaint; as well as an award of The Reserve's costs, attorneys' fees and litigation expenses in this action; and enter all other relief that this Court deems just and proper.

### Count II – Contribution

26.     The Reserve re-alleges and incorporates Paragraphs 1 through 24 of this Third Party Complaint as though fully set forth herein.

27.     Lincoln (and not The Reserve) was the entity responsible for managing and operating the Apartment Complex at all relevant times, including the calculation of "recapturable expenses" and the collection of rent and other charges from tenants including Rojas.

28.     In her Complaint, Rojas alleges that she was referred to collections as a result of an allegedly miscalculated debt to the Apartment Complex.

29.     In the unlikely event that The Reserve be found liable for any part or all of the claims asserted against it by Rojas, The Reserve is entitled to and hereby sues to recover contribution from Lincoln for such claims, damages, and liability to the extent that any of Rojas's alleged damages were caused by the negligence or other fault or conduct of Lincoln or its employees or agents.

WHEREFORE, Third-Party Plaintiff The Reserve respectfully requests that the Court award judgment against Third-Party Defendant Lincoln for contribution for any and all alleged claims and liability of The Reserve for damages to Rojas arising from any claim asserted in her Complaint that were caused or contributed to by the negligence or fault or other conduct of Lincoln or its employees or agents; as well as an award of The Reserve's costs, attorneys' fees and litigation expenses in this action; and enter all other relief that this Court deems just and proper.

## Count III – Attorneys' Fees

30.     The Reserve re-alleges and incorporates Paragraphs 1 through 28 of this Third Party Complaint as though fully set forth herein.

31.     The "Management and Leasing Agreement" between The Reserve and Lincoln contains the following provision entitled "ATTORNEY'S FEES":

> "If either party brings any judicial action or proceeding to enforce
> its rights hereunder, the prevailing party shall be entitled, in addition
> to any other remedy, to recover from the non-prevailing party,
> regardless of whether such action or proceeding is prosecuted to
> judgment, all costs and expenses, including reasonable attorneys'
> fees, incurred therein by the prevailing party."

*Id.* at ¶ 9.

32.     The Reserve brings this Third Party Complaint to enforce its rights under its "Management and Leasing Agreement" with Lincoln.

33.     The Reserve has fulfilled all conditions precedent under the "Management and Leasing Agreement" that Lincoln executed and agreed to.

34.     To the extent The Reserve prevails on any count(s) set forth in its Third Party Complaint, Lincoln is contractually obligated to pay The Reserve's attorneys' fees, expenses and other costs incurred as a result of this litigation.

WHEREFORE, Third-Party Plaintiff The Reserve respectfully requests that the Court award The Reserve's costs, attorneys' fees and litigation expenses in this action; and enter all other relief that this Court deems just and proper.

Dated: June 30, 2020                           Respectfully submitted,

*/s/ M. Wilson Stoker*
M. Wilson Stoker
State Bar No. 24076806
**COKINOS | YOUNG**
900 S. Capital of Texas Highway
Las Cimas IV, Suite 425
Austin, TX 78746
Tel. (512) 476-1080
Fax: (512) 610-1184
wstoker@cokinoslaw.com

**ATTORNEYS FOR DEFENDANT**
**THE RESERVE AT SPRINGDALE, L.P.**

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which served the foregoing on the following counsel of record via CM/ECF, E-mail and/or first class mail:

Tyler Hickle, Esq.
4005 Banister Lane
Building C, Ste. 120
Austin, TX 78704
tyler@hicklepllc.com
Phone: (512) 289-3831
Fax: (512) 870-9505

*Counsel for Plaintiffs*


Thomas A. Clarke
Attorney at Law
8026 Vantage Drive
Suite 105
San Antonio, TX 78230
(210) 340-8448
Fax: 210/348-7946
Email: tclarkeatty7@aol.com

*Counsel for Defendants,*
*Tolteca Enterprises, Inc. and*
*Travelers Casualty and Surety Company of America*


/s/ M. Wilson Stoker
M. Wilson Stoker

# Exhibit A

**to**
**The Reserve at Springdale, L.P.'s**
**Third-Party Complaint**

# MANAGEMENT AND LEASING AGREEMENT

This AGREEMENT is made as of 07/27/2015, between LINCOLN APARTMENT MANAGEMENT LIMITED PARTNERSHIP, a Delaware limited partnership ("**Manager**") and RESERVE AT SPRINGDALE, LP a Texas limited partnership ("**Owner**").

## RECITALS

A. Owner owns the property described in Exhibit A hereto (the "**Properties**," whether one or more) and desires to engage Manager as an independent contractor and Owner's agent to manage and lease the Properties pursuant to the terms and conditions hereof.

B. Manager is in the business of managing and leasing properties and is willing to render such services to Owner with respect to the Properties.

## AGREEMENT

In consideration of their mutual undertakings, Owner and Manager agree as follows:

1. APPOINTMENT. Owner appoints Manager, and Manager accepts appointment, as an independent contractor and Owner's agent on the terms and conditions hereof, with exclusive authority to rent and manage the Properties for Owner's account except as limited herein. Each party represents and warrants to the other that it has full right, power and authority (including any required licenses) to enter into and carry out this Agreement.

2. TERM; TERMINATION.
(a) Term. The term hereof shall commence on 06/01/2016 (the "**Start Date**") and, unless sooner terminated pursuant to Subsection 2(b), 2(c) or 2(d), shall continue for a twelve (12)-month period. Unless Owner elects not to renew this Agreement by written notice to Manager no later than thirty (30) days prior to the end of any current term, this Agreement shall be renewed automatically for successive twelve (12)-month terms, unless sooner terminated pursuant to Subsections 2(b), 2(c) or 2(d). Upon termination all documents will be turned over within fifteen (15) days from the termination date.

(b) General Termination Right. At any time, Owner and Manager each shall have the absolute power to terminate this Agreement, with or without Cause, upon thirty (30) days' prior written notice to the non-terminating party and Owner immediately may remove Manager from the Properties upon delivery of said thirty (30)-day notice; provided, unless terminated for Cause as set forth in Subsection 2(d), Manager shall be entitled to receive compensation for the subsequent thirty (30) day period in accordance with the terms of this Agreement.

j:\proj-new\3300\3332-000 springdale\05 a-e and consultants\property management\2015-06-05_final_lincoln-uag\draft_07-21-15_lpc-ryan_management leasing agreement redline- tr edits.docx 07/21/2015

(c) Termination on Sale. As to any of the Properties which is sold, exchanged or otherwise transferred by Owner during the term hereof, Owner shall provide Manager with at least sixty (60) days' prior written notice of the proposed transfer, and this Agreement and the obligations of the parties hereto (except liability under the indemnities set forth in Section 4 hereof and the obligation to pay fees earned and unpaid as of the date of termination) shall cease and terminate as of the effective date of the transfer.

(d) Termination for Cause. Either party may terminate this Agreement for Cause by delivering written notice thereof to the other party in which event this Agreement and the obligations of the parties hereto (except liability under the indemnities set forth in Section 4 hereof and the obligation to pay fees earned and unpaid as of the date of termination) shall immediately cease and terminate. "**Cause**" shall mean either (i) the failure by either party to perform or comply with any of its material obligations hereunder at the time or times and in the manner required hereunder without attempting to diligently and continuously commence curing such failure within ten (10) days after written notice from the other party (unless such failure is of a criminal or quasi-criminal nature, in which event no cure period shall be provided); or (ii) entry by a court of a decree or order for relief in respect of Manager or Owner in an involuntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, or appointment by a court of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar official of Manager or Owner of for any substantial part of their property, or for the winding up or liquidation of Manager's or Owner's affairs, which decree or order continues unstayed and in effect for a period of 60 consecutive days; or commencement by Manager or Owner of a voluntary case or action under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, or consent by Manager or Owner to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar official of Manager or Owner or for any substantial part of their property, or the making by Manager or Owner of any assignment for the benefit of creditors, or the failure by Manager or Owner generally to pay its debts as such debts become due or the taking by Manager or Owner of any action in furtherance of any of the foregoing.

3. MANAGEMENT SERVICES.  So long as it manages the Properties:

(a) Records; Office Space and Storage Space.  Manager shall maintain complete and accurate records of all transactions relating to the Properties and the supervision, management and operation thereof and shall make such records available for inspection by Owner at all reasonable times.  Owner shall provide Manager, without charge, a suitable storage area within the Properties for Manager's equipment, tools, materials and supplies furnished or consigned to Manager by Owner or furnished to Owner by Manager.  In addition, to the extent necessary, Owner shall provide, without charge, suitable office space for Manager's employees within the Properties, including telephone and utility service, personal computers, printers, a copy machine and miscellaneous office equipment as deemed necessary.

(b) Reports to Owner.  Manager shall (i) prepare a monthly accounting of all transactions relating to the Properties and forward it to Owner on or before the twentieth (20th) day of the succeeding month; (ii) provide Owner with such additional reports, records and documents relating to the

2

Properties as Owner may reasonably request from time to time; and (iii) comply with Owner's instructions as to the specific form or content of all reports, records or documents.

(c) Operating Budgets. No more than forty-five (45) days after the Start Date (for the period from the Start Date to the end of the calendar or fiscal year) and thereafter at least sixty (60) days prior to the commencement of each calendar or fiscal year (for the ensuing fiscal or calendar year), Manager shall submit to Owner a proposed operating budget which, after approval by Owner, shall be the approved budget (herein referred to as the "**Budget**" and items therein referred to as "**Budgeted**" items). Each proposed budget shall include: (i) by month, anticipated revenues by source and expenses by item; (ii) Manager's recommendations with respect to rental rates and discretionary expense items including advertising, reserves for replacements, capital improvements and on-site staffing, if any; and (iii) a written explanation describing all assumptions made by Manager in preparation thereof. If Owner disapproves of any proposed budget, Manager shall submit a revised proposed budget within fourteen (14) days after Owner notifies Manager of the specific reasons for Owner's disapproval. If Owner has not approved a proposed budget on or before the earlier of (i) sixty (60) days after Manager's submittal thereof; and (ii) the first day of the period to which such proposed budget is to apply; then the proposed budget shall be deemed to be the Budget and Manager shall operate the Properties in accordance therewith from the first day of the period to which it applies until Owner approves a revised proposed budget.

Manager shall use commercially reasonable efforts to ensure that actual costs do not exceed Budgeted amounts and shall promptly notify Owner of any projected material variance. Except for Emergency Expenditures (defined below) and expenditures arising due to circumstances not within the reasonable control of Manager, Manager shall not, without the prior written consent of Owner, incur any expense which would (i) cause any single line item indicated in the Budget to be exceeded by $5,000; or (ii) together with previous expenses in any major Budget category, exceed the Budgeted amount in such category by more than five percent (5%) on a quarterly basis. Prior to an Emergency Expenditure exceeding the above guidelines, Manager shall attempt to consult with Owner; provided, if Owner is not readily available, Manager may use its discretion regarding the same and Manager shall report the same to Owner as soon thereafter as commercially reasonable. "**Emergency Expenditure(s)**" means an expenditure deemed immediately necessary by Manager for the preservation and safety of the Properties or tenants or other persons, or to avoid the suspension of any service to the Properties.

(d) Leasing. Manager shall use commercially reasonable efforts to assist in the leasing of the Properties. In furtherance thereof, Manager shall (i) cooperate with Owner's designated leasing representative for the Properties and oversee the marketing and leasing process; (ii) negotiate new leases and renewals of existing leases; provided Owner shall furnish Owner's standard approved lease form to Manager and shall approve proposed tenants (including the creditworthiness of proposed tenants) and the form and substance of leases, and leases will not be effective until executed by Owner as landlord; (iii) on behalf of Owner, handle tenant requests and negotiations and perform the landlord's obligations under the leases; and (vi) terminate tenancies, sign and serve notices deemed necessary by Manager and use commercially reasonable efforts to assure compliance with lease terms by tenants.

3

(e) <u>Repairs and Maintenance</u>. To the extent Owner provides funds therefor, Manager shall purchase supplies and equipment for the maintenance and operation of the Properties and shall make (or cause to be made) and supervise all repairs, replacements, alterations, additions, improvements, decorations and maintenance on the Properties required by Owner or set forth in the Budget. Owner shall reimburse Manager, at Manager's market rate for maintenance services performed by Manager, including any direct employees of Manager performing services at the Property, which expenditures must be pre-approved by Owner unless authorized by the Budget.

(f) <u>Services</u>. In its capacity as Owner's agent, Manager shall select, supervise and engage in Owner's name and at Owner's expense, all independent contractors, suppliers and vendors for the operation, repair, maintenance and servicing of the Properties including those necessary for the supplying of electricity, gas, steam, water, telephone, cleaning, fuel, oil, elevator and HVAC maintenance, vermin extermination, trash removal, security, landscaping and snow removal and other services deemed necessary or advisable by Manager.

(g) <u>Insurance</u>. Owner shall obtain, or cause to be obtained, all insurance on the Properties which is necessary or advisable, in the opinion of Owner after consultation with Manager, to protect the interests of Owner and Manager from liability for injury to persons or damage to property. Such insurance coverage shall include: property coverage on the buildings and tenant improvements subject to the perils of "all risk," at replacement cost; Boiler and Machinery coverage; and Commercial General Liability coverage insurance. The insurer, coverages and limits of liability shall be determined by Owner after consultation with Manager and shall be commercially reasonable under the circumstances. Such insurance policies shall name Owner and Manager as insured parties and, when appropriate, include a "waiver of subrogation" as to claims against Manager and its agents and suppliers with respect to any covered loss arising out of the performance of the services under this Agreement to the extent of any insurance proceeds paid under such policies. Owner shall deliver evidence of such insurance, in the form of Certificates of Insurance, to Manager. Manager and Owner agree that leases will require tenants to name Owner and Manager as Additional Insureds under insurance coverages procured by tenants. Manager may not settle claims under a given policy without the prior consent of the other insured parties thereunder.

With respect to employees of Manager performing work on matters relating to the Properties, Manager shall obtain Fidelity coverage and Workers' Compensation coverage. Additionally, Manager shall require all vendors providing materials or services in connection with Manager's obligations under this Agreement to carry Workers' Compensation on their employees. Manager also shall provide Commercial General Liability, Automobile Liability and Errors and Omissions Liability coverages on Manager's operations. Limits of liability for the aforementioned coverages to be provided by Manager shall be commercially reasonable under the circumstances and shall be agreed upon by Owner and Manager.

(h) <u>Compliance With Laws</u>. Manager, at its own expense, will obtain any license required to be held by Manager to perform its services hereunder. Manager shall deliver immediately to Owner all written notices pertaining to the Properties received by Manager from federal, state and local governmental authorities with jurisdiction over the Properties ("**Authorities**"). At the request and expense of Owner, Manager shall use commercially reasonable efforts to comply with, and

4

cause the Properties to be kept in compliance with, all applicable orders, regulations or requirements of Authorities. Owner acknowledges that Manager is not an expert with respect to (i) the detection or handling of substances or materials defined in or governed by environmental laws and regulations as dangerous, toxic or hazardous pollutants, contaminants, chemicals, wastes, materials or substances ("**Hazardous Materials**"); or (ii) requirements under the laws and regulations relating to accessibility of facilities for disabled, handicapped and/or physically challenged persons including the Americans With Disabilities Act of 1991, as amended ("**Accessibility Regulations**"). Owner shall retain such consultants and legal experts as are necessary to determine the nature and extent of Hazardous Materials on the Properties as well as the steps to handle, control or remove them and Owner agrees to defend, indemnify and hold Manager harmless from and against Damages (as said term is defined in Subsection 4(a) below) arising out of Hazardous Materials on the Properties. Owner also shall retain such consultants and legal experts as are necessary to determine changes in the Properties, if any, required now or in the future by Accessibility Regulations.

(i) Legal Assistance. Manager may, with the prior consent of and at the expense of Owner, engage counsel to advise on legal matters and conduct legal proceedings arising in the performance of Manager's duties under Subsections 3(d), 3(e), 3(f), 3(g), 3(h), and 3(m) hereof. With Owner's consent, Manager may institute legal proceedings, which shall be in the name of and at the expense of Owner. Owner shall pay Manager an administrative fee equal to $100 per hour for managing and participating in any such legal proceedings.

(j) Employees. Manager shall hire, supervise and discharge personnel reasonably necessary to be employed, consistent with the Budget, to maintain and operate the Properties. All employment arrangements shall be solely Manager's concern, such personnel shall, in every instance, be the employees of Manager and Manager shall comply with all applicable laws and regulations affecting the employer/employee relationship. All compensation and related costs and expenses of such employees, including payroll, customary payroll taxes and fringe benefits (including bonuses, 401K plans and administrative expenses associated therewith, and other insurance or retirement benefits consistent with the Budget), medical and health insurance, workers' compensation, vacation, severance, training costs, State and Federal employment taxes and Social Security contributions, shall be deemed to be expenses reimbursable to Manager by Owner. If any of Manager's employees perform work on matters not relating to the Properties, Manager shall fairly allocate the compensation of such employees between their work at the Properties and such other work. Compensation and related costs for Manager's executive and administrative staff who oversee Manager's onsite personnel shall not be expenses reimbursable to Manager by Owner. Owner agrees that, during the term of this Agreement and for a period of twelve (12) months following its expiration or termination, it will not employ, nor offer to employ, directly or indirectly through its agent or successor managing agent, employees of Manager without the prior written consent of Manager, which consent may be withheld in Manager's sole and absolute discretion.

(k) Rules and Regulations. Manager shall propose to Owner any necessary or appropriate rules and regulations for the operation of the Properties.

(l) <u>Depository Accounts</u>.  Manager shall promptly deposit all receipts collected for or on behalf of Owner in its management account.  Manager shall account for all such monies separately from all other projects and its personal and company monies.

(m) <u>Collections; Authorized Expenditures; Reimbursements; Challenges to Impositions</u>.
Manager shall calculate recapturable expenses and bill tenants therefor as provided in the leases and shall collect rents and other charges and give receipts therefor as appropriate.  Manager's prudent expenditure of funds in the management account for purposes and in amounts consistent with the Budget is hereby authorized.  Specifically, Manager shall pay (i) all bills which Manager determines are properly payable including for loan payments and operating expenses; (ii) water and sewer charges, real estate taxes and installments of special assessments and other charges and impositions of every nature with respect to the Properties; and (iii) Manager's management fees and any other amounts owed to Manager hereunder.  Owner shall notify Manager in writing if Owner elects to have any payments made in a manner other than as provided herein.  At the direction of Owner, Manager shall defend against, seek revision of, or appeal from any assessment or charge deemed improper, or pay any such charge or assessment under protest and seek a refund thereof.  Manager may, if it deems it advisable and with the prior consent of Owner, employ independent real estate experts acceptable to Owner for appraisals and testimony in connection with such actions.  Manager shall, at the direction of Owner, compromise or settle any such proceeding or claim.

(n) <u>Management Fees</u>.  As compensation for its management services, Owner shall pay Manager a monthly fee calculated as a percentage (which is set forth on <u>Exhibit B</u> hereto) of Gross Cash Receipts from the operations of the Properties during the previous month; provided at no time shall the monthly management fee be less than the monthly minimum amount set forth on <u>Exhibit B</u>.  Said fee shall be due and payable on the first (1st) day of the succeeding month (and on or after the first day of each month, Manager may issue itself a check out of the property management account therefor).  **"Gross Cash Receipts"** includes all rental income including base rent, operating expenses, common area maintenance charges, percentage rent, parking fees (if Manager services the parking area) and late charges. **"Gross Cash Receipts"** does not include security deposits (until applied to unpaid rent), prepaid rent (until applied to the applicable month's rental payments), sales proceeds, insurance proceeds (except those based on lost rental income), tenant services provided by Manager for an additional fee paid by a tenant, tax refunds, administrative expenses or management fees paid by tenants, condemnation awards, or any cash proceeds received outside the day-to-day operation of the Properties.

(p) <u>Other Services</u>.  Manager shall perform such additional administrative and managerial duties in connection with the Properties as Owner may from time to time reasonably request in writing for such compensation as may be agreed upon by Owner and Manager.

(q) <u>Services for Tenants.</u>  It is understood that Manager may from time to time perform services requested by tenants of the Property which are not included in the services to be provided by Manager for Owner pursuant to this Agreement; and Owner agrees that Manager shall be entitled

6

to retain all amounts paid by tenants for such services, including all profit earned by Manager therefrom.

4. INDEMNIFICATION.

(a) By Manager. To the maximum extent permitted by law, Manager shall indemnify, hold harmless, protect and defend (with counsel reasonably acceptable to Owner) Owner and its officers, directors, shareholders, employees and agents from and against any and all claims, demands, actions, fines, penalties, liability, losses, taxes, damages, costs, injuries and expenses (including, without limitation, reasonable attorneys', consultants' and expert witness' fees and costs ) (collectively, "Damages") in any manner related to, arising out of or resulting from (i) any default by Manager in its obligations under this Agreement; (ii) any acts of Manager beyond the scope of its authority under this Agreement; and (iii) any gross negligence, willful misconduct or fraud of Manager or any agent or employee of Manager. Notwithstanding any other provision in this Agreement to the contrary, Manager's obligations under this Subsection 4(a) shall survive the expiration, termination or cancellation of this Agreement.

(b) By Owner. To the maximum extent permitted by law, Owner shall indemnify, hold harmless, protect and defend (with counsel reasonably acceptable to Manager) Manager and its officers, directors, shareholders, members, partners, employees and agents from and against any and all Damages in any manner related to, arising out of or resulting from Manager's performance of services which are (i) within the scope of Manager's authority under this Agreement; and (ii) not within the scope of Manager's indemnity set forth in Subsection 4(a) above. Notwithstanding any other provision in this Agreement to the contrary, Owner's obligations under this Subsection 4(b) shall survive the expiration, termination or cancellation of this Agreement.

5. AMENDMENTS. This Agreement may be amended by, and only by, a written agreement signed by Owner and Manager.

6. NOTICES AND CONSENTS. Notices, consents and other communications required or permitted hereunder or by law shall be in writing (or oral followed as soon thereafter as commercially reasonable by a written confirmation) and shall be deemed to have been given as of the date such notice is (i) delivered to the party intended, (ii) delivered to the then-designated address of the party intended, (iii) rejected at the then-designated address of the party intended, provided such notice was sent prepaid, or (iv) sent by nationally recognized overnight courier or by United States certified mail, return receipt requested, postage prepaid and addressed to the then-designated address of the party intended. The initial addresses of the parties shall be:

Manager:             Lincoln Property Company
                     2000 McKinney Avenue
                     Suite 1000
                     Dallas, TX 75201
                     Attn: Scott Wilder and Kim McCormick

7

Owner:                     Reserve at Springdale, LP
                                        c/o AAHC
                                        1124 S IH 35 Frontage Rd
                                        Austin, TX  78704
                                        Attn:  Ron Kowal

The foregoing addresses may be changed upon prior written notice thereof.

7. NONASSIGNABILITY.  Owner makes this Agreement in reliance upon Manager's experience and ability and Manager may not assign or transfer this Agreement without the prior written consent of Owner; provided Manager may perform any of its duties hereunder through a wholly-owned subsidiary but Manager shall not be relieved thereby of any of its obligations hereunder.

8. APPLICABLE LAW.  This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota.

9. ATTORNEY'S FEES.  If either party brings any judicial action or proceeding to enforce its rights hereunder, the prevailing party shall be entitled, in addition to any other remedy, to recover from the non-prevailing party, regardless of whether such action or proceeding is prosecuted to judgement, all costs or expenses, including reasonable attorneys' fees, incurred therein by the prevailing party.

10. WAIVER.  No failure or delay by either party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver in one instance be deemed to be a continuing waiver in any other instance.

11. COMPETITION.  This Agreement shall not restrict Manager from managing, leasing or owning other properties of any kind, including similar rental properties in the same geographical area.

12. ENTIRE AGREEMENT.  This Agreement constitutes the entire agreement and understanding of the parties hereto, and each of them, with respect to the subject matter hereof, and it supersedes all prior agreements, negotiations, discussions and understandings relating to the subject matter hereof.

13. INTERPRETATION.  Whenever required by the context hereof, (i) the singular shall include the plural, and vice versa, and the masculine shall include the feminine and neuter genders, and vice versa, and (ii) use of the words "including", "such as", or words of similar import, when following any general term, statement or matter shall not be construed to limit such statement, term or matter to specific items, whether or not language of non-limitation, such as "without limitation", or "but not limited to", are used with reference thereto, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest scope of such statement, term or matter.  The exhibits attached hereto are incorporated herein by reference.  The captions preceding the text of each section hereof are included only for

8

convenience of reference. Captions shall be disregarded in the construction and interpretation hereof. Invalidation of any of the provisions contained herein, or of the application thereof to any person by judgment or court order, shall in no way affect any of the other provisions hereof or the application thereof to any other person and the same shall remain in full force and effect.

14. BINDING EFFECT. Subject to Section 7, this Agreement shall be binding upon and inure to the benefit of Manager and Owner and their respective successors and permitted assigns.

15. COUNTERPARTS. This Agreement may be executed in several counterparts, each of which shall be deemed an original. The signatures to this Agreement may be executed on separate pages and, when attached, this Agreement shall constitute one (1) complete document.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

| OWNER: | MANAGER: |
|---|---|
| **RESERVE AT SPRINGDALE, LP,** a Texas limited partnership | **LINCOLN APARTMENT MANAGEMENT LIMITED PARTNERSHIP,** a Delaware limited partnership |
| By:    Springdale Community Development GP, LLC, a Texas limited liability company, its general partner | |
| | By:  Lincoln BP Management, Inc., |
| By:    Austin Affordable Housing Corporation, a Texas nonprofit corporation, its sole member | a Texas corporation, its general partner |

By: _____

Its: _____Ron Kowal_____

Date: _____July 28, 2015_____

By: _____

Name: _Allyson McKay_
Vice President

Date: _____7.27.15_____

10